UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JAMES STEPHAN ZIMMERMAN,

                    Petitioner,                    Case No. 1:11-cv-568

v.                                                 Honorable Janet T. Neff

WILLIE SMITH,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254.  Petitioner was convicted by a Saginaw County jury of one count each of aggravated
stalking, MICH. COMP. LAWS § 750.411i, extortion, MICH. COMP. LAWS 750.213, attempted unlawful
imprisonment, MICH. COMP. LAWS § 750.349b, and felonious assault, MICH. COMP. LAWS § 750.82.
On August 14, 2008, Petitioner was sentenced to respective prison terms of 24 months, 84 to 240
months, 24 to 60 months, and 24 to 48 months.  He raises the following six grounds for habeas relief:

I.      PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR
        TRIAL WHERE THE ORIGINAL JUDGE WAS SUBSTITUTED MID-
        TRIAL.

II.     PETITIONER WAS DENIED DUE PROCESS WHERE INSUFFICIENT
        EVIDENCE WAS PRESENTED.

III.    PETITIONER WAS DENIED A FAIR AND IMPARTIAL TRIAL WHERE
        THE COURT EXCUSED FOUR JURORS WHO HAD MISDEMEANOR
        CONVICTIONS.

IV.     PETITIONER WAS DENIED HIS RIGHT TO PRESENT A DEFENSE BY THE COURT'S REFUSAL TO ALLOW PETITIONER TO CHALLENGE THE COMPLAINANT'S CREDIBILITY AND PRESENT CORROBORATING ALIBI DEFENSE.

V.      PETITIONER WAS DENIED DUE PROCESS WHERE THE COURT ADMITTED NON-AUTHENTICATED EVIDENCE.

VI.     PETITIONER WAS DENIED A FAIR TRIAL BY THE PROSECUTOR['S] MISSTATEMENT OF THE LAW.

(Pet., docket #1, Page ID##7-8, 10, 12, 18-19.)

Respondent has filed an answer to the petition (docket #10) stating that the grounds should be denied because they are either procedurally defaulted or without merit. Upon review and applying the AEDPA standards, I find that all grounds are procedurally defaulted and/or without merit. Accordingly, I recommend that the petition be denied.

### Procedural History

#### A.      Trial Court Proceedings

The state prosecution arose from an incident that occurred on December 3, 2007, during which Petitioner confronted his former spouse, who had previously obtained a personal protection order (PPO) against Petitioner. Petitioner was charged with aggravated stalking, extortion, attempted unlawful imprisonment, and felonious assault. Following a preliminary examination held December 19, 2007, Petitioner was bound over on all charges. (Prelim. Exam. Tr. at 91-92, docket #13.)

Antonina ("Tonya") Zimmermann, a Russian national, testified that she met her husband when she was 24. He came to the Ukraine as part of a tour group designed to introduce American men to Russian and Ukrainian women. They were married for seven and one-half years

and had two children, Jacob and Alex. Petitioner also had a son by a prior marriage, James II (Beau), who lived with them. (Tr. III[1] at 12-16.) Over time, the marriage deteriorated, and Tonya met another man, Mark Hansel. In the summer of 2007, Tonya and her two sons traveled to the Ukraine to visit Tonya's family. While she was gone, she communicated with Hansel by e-mail. She returned home in August, 2007, intending to seek a divorce. (*Id.* at 18-19, 27.) Her husband met her at the airport and told her that he had been diagnosed with cancer and would not live until Christmas. She drove home with him, having decided to stay to take care of him. (Tr. III at 19.) Petitioner was kind when she arrived, and they were intimate after the children went to bed. Petitioner then covered her mouth and whispered in her ear, "Mark Hansel." Petitioner showed her the e-mails he had printed from her personal e-mail account. He then told her that Hansel had AIDS and that she had gotten it from Hansel, so she could expect to die within five years. (*Id.* at 20.) The marriage deteriorated further, and Tonya became fearful of Petitioner. The court refused to admit further testimony about events preceding October 2007, on the grounds that it would be tangential to the charges in issue. (*Id.* at 21-23.)

On October 10, 2007, Tonya left the marital home and went to a shelter, taking her two children with her. Near that same date, she obtained a personal protection order against Petitioner. (*Id.* at 27-28.) At Halloween, she made plans to take the children trick-or-treating. She

---

[1]The case was tried over a period of six days, beginning on June 18, 2008, and ending on June 27, 2008. Because more than one court reporter was used, the transcript volume numbers are not consistent. For purposes of this report and recommendation, I will refer to the volumes of the trial transcript as follows:

"Tr. I at __" for June 18, 2009 (docket #14);
"Tr. II at __" for June 19, 2008 (docket #15);
"Tr. III at __" for June 20, 2008 (docket #16);
"Tr. IV at __: for June 25, 2008 (docket #17);
"Tr. V at __" for June 26, 2008 (docket #18);
"Tr. VI at __" for June 27, 2008 (docket #19).

asked Jacob to call Beau to see if he wanted to join them. Jacob and she both talked to Beau. During the call, Petitioner told Beau to tell Tonya to come home. Petitioner subsequently took the phone. She told him that she did not want to talk to him. Tonya made arrangements to meet Beau at the public library. She picked him up, and they drove to Beau's grandmother's house (Nanny's house) in Saginaw, where the children had always trick-or-treated. (*Id.* at 29-31.) As they started to walk to neighboring houses, Beau handed Tonya a piece of paper containing a phone number and told her that Petitioner wanted her to call. She put it in her pocket. Before they reached the first house, Petitioner touched her from behind. He asked her not to call the police for violating the PPO, and she agreed. They walked a couple of blocks, but, because it had begun to rain hard, she decided to end the trick-or-treating early. Petitioner's van was nearby, and he offered to drive the children and Tonya back to her car. Because she wanted to get the children out of the weather, she agreed. (*Id.* at 32-33.) Once the children were in the van, Petitioner closed the door, telling her to be quiet and not to do anything stupid, because he wanted to talk to her. She opened the passenger door and began yelling at the children to get out while trying to open the sliding door. Petitioner tried to get her to stop screaming, but then began struggling to push her into the van. (*Id.* at 33-35.) She tried to flag someone down, and people eventually began to walk closer to them. Tonya tried to get the children out, and she eventually told Petitioner that, if he did not let the children out of the van, she would have the people call 911. Petitioner covered her mouth and stated, "[Y]ou don't want me to blow your brains out in front of the children do[] you?" (*Id.* at 36.) She ran down the road, trying to flag a car. As a family approached, she again told him that, if he did not let the children out, she would tell the family to call the police. (*Id.* at 36-37.) Petitioner let the children out, but he told Jacob to remain next to him until Tonya heard the notes he intended to read to her. Tonya refused

to stay, taking the children with her. As they went back to Nanny's house, Beau apologized, telling

her that he knew that his father had planned to come. (*Id.* at 37-38.) As she returned to the shelter,

she concluded that she should call the police, even though Petitioner had asked her not to. She called

the Vassar Police Department, who referred her to the Saginaw Township Police Department.

Because it was late and the children needed to go to bed, she went in to the police department in the

morning, where she reported the incident. (*Id.* at 39-40.)

Sometime in November, Petitioner went to Alex's school. He told the teacher that

Tonya needed to get home because someone from her family had called from Russia to say that

something serious had happened to her mother. The teacher relayed the message. Tonya told her

that she would buy a phone card and call her mother. Petitioner then appeared around the corner and

told her that it was her aunt who had called from Russia, and that he had made arrangements for the

aunt to call back at 9:00 a.m. at the family home in Vassar. Petitioner told Tonya that he had made

coffee in anticipation of her coming to wait for the call. She did not go with him because she was

afraid of him. She contacted family members and determined that Petitioner had fabricated the story.

(*Id.* at 40-42.)

On December 3, 2007, Tonya had been working as a sales clerk at Bronner's in

Frankenmuth for about six weeks. She finished her shift at 5:00 p.m., and she went out to her car

in the employee parking lot. (*Id.* at 42-44.) As she was about to enter her car, she noticed something

lying under the front tire. It was a wooden block with two large nails facing the tire. She pulled it

out and went to check the other side of the car, where she found another block. Tonya threw them

both in front of her car. Before she could get into her car, Petitioner pulled his vehicle behind her

car, blocking it in, and he got out. (*Id.* at 44.) Petitioner was wearing his black trench coat and a

rolled-up ski mask, neither of which he regularly wore. Tonya backed away from her car in fear of him. (*Id.* at 44-46.) Petitioner told her that he wanted to talk to her. She asked why he was there, because it was two days before a scheduled hearing on the PPO. Petitioner told her that he did not care; he knew that she would report him to the police. (*Id.* at 346-47.) Tonya asked him to leave. Petitioner told her that he had her birth certificate and, if she wanted it, she needed to come to his car to get it. Tonya had previously asked Petitioner to return her birth certificate, because she needed it to rent an apartment, and she could not easily obtain a new one, due to the dissolution of the Soviet Union. However, she did not want to get into Petitioner's vehicle, because she was afraid that it was a trap. (*Id.* at 47-48.) Petitioner began to walk towards her, and she began backing up over a gravel berm that separated the parking lots. Petitioner started yelling at her. She told him to leave her alone. She noticed that he had one hand in his pocket and held a crowbar at his side with the other. (*Id.* at 48-50.) As Tonya continued to back up, she noticed another woman in a van on the opposite side of the berm, and she began to back towards the woman. (*Id.* at 49-50.) The woman started to get out of her car, and Tonya ran to her. (*Id.* at 50, 55.) Petitioner left. Shortly thereafter, Emma, a woman Tonya worked with, pulled her van into the lot. Tonya was frightened that Petitioner would follow her when she went to pick up her children. Emma offered to and did follow Tonya all the way to Vassar to pick up her children, and then followed her to the shelter where Tonya was staying. (*Id.* at 50-51.)

Later that evening, Tonya received a telephone call from her work supervisor, who informed her that Emma had flagged down a police officer on her way back from Vassar. The police officer advised Tonya to file a report, but he told Emma that, because of the hour, she could do so in the morning. (*Id.* at 52-53.) The following morning, Tonya stopped first at the Vassar Police

Department, because they were already aware of her situation. The officer told her that she had to file a report with the Frankenmuth Police Department, which she did. (*Id.* at 53-54.) Tonya subsequently learned that the witness who had been in her car at the time of the incident also had seen Petitioner in the parking lot a week earlier. (*Id.* at 54-55.)

Tonya Zimmerman's testimony was corroborated by the testimony of Emma Montague. Montague testified that, on December 3, 2007, after she ended her shift at 5:00 p.m., she went out the employee exit to get into her car. She saw a man who was wearing a dark trench coat and a stocking cap, standing near the berm that divided the two parts of the parking lot. Montague heard raised voices. (Tr. II at 54-56.) Montague turned her car to approach the other lot, the opposite direction she would have headed to go home. She noticed that it was Tonya standing on the opposite side of a bush from the man. She stopped and waited for a short time, thinking that she might pull her car over and offer Tonya a ride. Montague saw a dark green or black car parked at a diagonal, blocking Tonya's car. (*Id.* at 66.) She subsequently saw a car leave the lot. She pulled up where the other car had been located. (*Id.* at 57-58.) When Montague arrived, Tonya was crying and upset. Tonya told Montague that the man had been her ex-husband, and she said that her husband had put boards with nails underneath her front tires. (*Id.* at 58-59.) Montague suggested that Tonya not go home right away, but Tonya wanted to pick up her children as quickly as possible. (*Id.* at 58-59.) Tonya expressed fear that her ex-husband would run her off the road and hurt her. Montague followed Tonya to her sitter's house, to make sure she got there safely. (*Id.* at 59-60.) To do so, Montague drove from Frankenmuth to Vassar, in the opposite direction of her own home. (*Id.* at 60.) When she got back to Frankenmuth, Montague remained worried about Tonya. She saw a police officer near Bronner's, and she flagged him down. The officer told Montague to have Tonya

go to the police station.  (*Id.* at 61.)  Montague saw her own boss, Carol Schnell, who was across the street.  Montague told Schnell what had happened and what the police officer had told her.  (*Id.* at 62.)  Although Montague did not go to the police herself that night, she went in to give a statement the following day, after Tonya had made her report.  (*Id.* at 63.)

Further corroboration was provided by Camisha Seaman, another Bronner's employee.  Seaman testified that she took her lunch break at 5:00 p.m.  She went to McDonald's and then ate in her Dodge Durango, which was parked in Bronner's parking lot near the employee entrance.  (*Id.* at 119-20.)  As she got ready to get out of her car to go inside Bronner's, Seaman heard arguing.  A man kept yelling at a woman Seaman did not know, saying, "You're lying, you're lying."  (*Id.* at 121, 132.)  The woman kept responding that she was not lying and that he needed to leave.  (*Id.*)  The man repeatedly told the woman to get into his car, and she repeatedly refused.  (*Id.*)  The man's tone of voice was very aggressive.  Seaman remained in her car because she thought the woman might need to make a phone call, in which case Seaman could lead her through the employee entrance.  (*Id.* at 122.)  She watched as the woman walked backward, clutching her purse.  (*Id.* at 123.)  The woman backed over the berm, and the man continued to follow her over the berm.  Seaman testified that the man was tall and fairly thin, and he was wearing a long, black coat and had a hat or something on his head.  (*Id.* at 124, 134.)  She also noticed that he had something in his hand.  (*Id.* at 125.)  As the woman approached Seaman's vehicle, she looked scared.  (*Id.* at 127.)  Seaman got out of her vehicle, and the woman asked her not to leave, explaining that the man was her ex-husband.  The woman asked Seaman to walk her to her car, which Seaman did.  Seaman asked the woman if she was alright and if she needed to use the phone.  As she approached the other lot, Seaman saw the man leaving in his green car.  (*Id.* at 128-29.)  According to Seaman, the woman

was distraught and scared.  (*Id.* at 132.)  Seaman testified that she had seen the same car in the lot on the previous Friday, November 30, 2007, at about 5:00 p.m., as she left work with a co-worker. On that occasion, the man was wearing a trench coat and had a ski mask pulled down over his face, which left only his eyes exposed.  Both she and her co-worker were nervous and got into the car quickly.  (*Id.* at 129-30, 132.)  After she got into her car, Seaman watched the vehicle to see where it was going, because she was afraid that someone might have been vandalizing her car.  The car proceeded north.  (*Id.* at 131.)

Prior to the fourth day of trial, June 25, 2008, Judge Kaczmarek, the original judge presiding over the trial, had a family emergency out of state, and he was unable to return to finish the case.  Judge Borrello was permitted by the State Court Administrative Office to replace Judge Kaczmarek only after he familiarized himself with the case to determine whether he could be sufficiently informed to proceed or whether a new trial was required.  Judge Borrello read the entire transcript to date, reviewed the motions that had been filed and decided, and concluded that he could proceed.  (Tr. IV at 3.)

During cross-examination of the complainant, defense counsel attempted to introduce character evidence that she had married Petitioner to gain entry into the United States and had unlawfully opened a bank account in another name.  The court disallowed the evidence as irrelevant to the issues to be decided in the case.  (*Id.* at 7-8.)

Saginaw County Deputy Sheriff Richard Delong testified that, on January 5, 2008, he was a corrections officer at the Saginaw County Jail.  During a routine search of incoming mail, Delong searched a letter sent by Petitioner to Gregg Dickhausen (a/k/a Kegger), which had been returned due to an insufficient address.  (*Id.* at 55-56.)  After scanning the contents of the letter for

threats or other security issues, Delong gave the letter to his shift commander, who forwarded it up the chain of command, to the detective bureau. (*Id.* at 57.) Over the objection of the defense on various grounds, the court admitted the letter. (*Id.* at 69.) Delong read the letter into the evidence, as follows:

Kegger, do not respond to his letter, the [sic] open mail here. I will send you all letters or notices via my lawyer. He doesn't know what I am writing. Everything is between just you and me. Tell no one what we are doing unless I say different.

I don't need any extra time and you don't need any at all. This will be easy and we won't get caught if you follow my directions and help me. I know I will owe you one. I have done this. I have to – this done. I will ge out and I will get the kids if this happens. This is my life here and I need your help. I'm looking at life, for God's sake.

Whatever you do be very careful. Use gloves. Do not get seen. Do not go anywhere you think there might be a camera. In other words, think all the way through. I have had nothing but time to put this together and it will be simple. Borrow the money from Rob. His number is (989) 233-6261. Do not tell him what it's really for. Tell him it's to pay off some bills for me. Do not tell him which ones in case he wants to pay them directly himself. I will be asking him for it in the other letter which I want you to call him and give to him. He may be out of the country so tell him to call you when he gets home. If I get out before then we'll get together and do this together.

. . .

All right. Just – all right. First thing you need to do is find and follow this bitch. You got to have an idea of her daily schdule. Don't use your truck. Borrow your mom's car or something else. We cannot afford to have her suspicious at all. She takes Alex to school at 8:15 a.m. to Magic Years Preschool. She drives a Chevy Prism. The school is by the post office. Some days she stays at her friend's across the street from the post office, two-story white older house. It's 202 North Main Street and it's a white house. There will be a red or maroon Jeep Cherokee in the driveway. It's her friend's.

You will need to find out where she takes them for day care also. It will help my case to know this. Sometimes a day care person in an old silver Chevy Astro van will pick up Alex at 11:15. Follow it and find out where this day care is. I need the address, number and street. I'm 99.9 percent sure it's in Vassar.

She obviously has the Frankenmuth cops watching her so stay away from there except to follow her. That is not a crime. Just don't do anything illegal in that town. Look at me and I didn't do shit.

My guess would be the shelter has cameras, too. Keep your identity hidden somehow and your fingerprints off of everything. Cannot make any mistakes here. It's important.

After you have established her routine and whereabouts it's time to move in for the kill. Please do this ASAP so I can get those kids out and the kids away from her psycho ass and in a safe environment. Remember, you are not doing this just for me but more importantly for my kids. Please get this done, okay?

After you figure out her routine and get me the day care and shelter address and hopefully anywhere else she goes, document addresses, times, cities, people if possible. You know what to do. Then try and get as much money as possible. I'm talking in the neighborhood of $1,000. You will need a minimum of 500 to make anything stick . . . . The more you can get, the better. Quantity equals more time, plus the way we are going to do it.

Then you need to buy cheap baggies to put or transfer it in. Remember, don't touch the new baggies without gloves. Medical works best. Don't use Ziploc. This is the kind we used and we don't want her suspicious.

Okay. Here we go. Also – I can't really decipher this either. It's either – looks like A-L-E, in parenthesis powder, rocks, syringes. Don't touch Ecstasy – or syringes, don't touch. Ecstasy should do the trick. Meth will work, too. Don't overdo it by getting everything, just get preferably the A-L-E again – I don't know what that is – or rocks. This will get her some time.

Separate it into multiple baggies and put all baggies into one bag. Distribution will carry more weight than personal use. Make sure it's more than 28 grams if possible. Wherever you get it, don't say what it's for or that I wanted it. It's for you, period. Can't risk anyone knowing what we are doing. Remember, we are all fucked if anyone finds out, so be careful.

After you get it bagged up, get it in her car right before you make the call to turn her in. I personally would put it in at nights and then call it in the next morning where you can witness her getting arrested. What I'm thinking is put it in real late at night, and I believe it's in Caro or in cars or somewhere –

. . .

- 11 -

Get Matt to help you. Both of you drive separate cars and have walky-talkies to communicate. Wait for her to leave in the morning and you follow her. Then tell Matt where you are, wrote in parenthesis, and give him the make, model and license plate from her car and have him call it in from a pay phone and be anonymous. Say he is calling because he witnessed a drug deal between her and a big nigger in whatever parking lot and you wanted to call because the woman have little kids with her. Remember, she knows your trucks and what you look like so you follow at a distance.

After she has been arrested, know what county you are in. Then call my dad and say Matt was coming back from Caro and I thought he saw Tonya getting arrested but was not sure if it was her or not so he called you and asked what kind of car she drives. You told him it might be possible and that is why you were calling my dad to relay the possible info. Tell my dad you are not sure but he might want to call whatever county jail to see if it's true or not, especially if the kids are with her. If they are, say to my dad, he, Matt in parenthesis, thought the kids were with her so he can go get custody of them.

If the kids, if the kids are that – if the kids are, that would be great but because then she gets child endangerment tacked on. More jail time, ha, ha, and we'll lose the kids.

I want the distribution charge because she will pass a piss test probably. These two charges would explain her character, where she has been getting her money. Prostitution would be easier to prove, and most important she only cares about herself and not her kids because she is doing this while they are with her.

. . .

I want you to do this with or without the kids in the car. I would prefer they were. Extra charge, like I said, and a deadly one for her.

Now talking to inmates here. Saginaw County is the worst jail to be in. They try to get her – try to get her arrested so she can have a taste of this hell. Tuscola Jail is like a kingdom compared to this place, but if that's where you need to get her with the kids, so be it. Getting her in Saginaw with the kids would be the ultimate bonus. If it is Tuscola, don't do it unless kids are with her because she will only get probation there. Kids need to be with her. Saginaw don't care.

Just get her arrested. See how she likes – see how she likes fake charges. Fucking evil cunt. If she goes down with kids, make sure my dad knows but doesn't know it's us. Make sure you get me her address, day care and any boyfriend's addresses as well.

Remember, be careful and I will and my kids will owe you big. Please don't chicken out on this. I have to get my kids away from this psycho bitch. Insure Rob – insure Rob I will pay him back. I probably have a job when I get out. Remember to ride my lawyer and dad's ass . . . .

Shit. Before I forget, I was with you on 12/3/07. You were at my house. The truth is I was at home with Beau, but I don't want him involved, unlike Tonya. I will not put my kids through this mental abuse and use them to help me. This is just wrong. Plus, even though I was with Beau, which is the truth, his alibi would be considered weak.

You were there – you were there that night and we had pizza at my house. The prosecutors would tear Beau apart and he doesn't need any more hell. Hope you understand. We'll just need to get our stories straight before court begins. We'll do this later.

Thanks for your help and be very careful. Tonya is smarter than I thought. Please do this. It's more for the kids than me.

(*Id.* at 72-80.)

Petitioner's son, Beau Zimmerman, testified that, after his father received the PPO, he would take Beau on "rides," during which they would look for Tonya. (*Id.* at 86-87.) After a period of time, Beau told his father that he "did not want to be part of it anymore" and that he "wanted to stay home." (*Id.* at 88.) Beau told his father at least once that he needed to stay away from Tonya. (*Id.* at 99.) Subsequently, on Halloween of 2007, Beau made arrangements to be picked up by Tonya at the public library, so that he could join his brothers in trick-or-treating from his maternal grandmother's house in Saginaw. His father was aware of the plan, though Beau did not recall talking to him about it. The boys went into the house to see Beau's grandparents. They then started trick-or-treating. (*Id.* at 89.) While they were walking around, Petitioner showed up. Tonya was initially shocked, but Petitioner walked with the family for awhile. It began to rain, and, when they neared Petitioner's van, Petitioner told all of the boys to get in. He watched Petitioner

- 13 -

and Tonya talk outside the van, though he could not hear or remember what they were saying. (*Id.* at 90.) Eventually they began arguing. Tonya did not get in the van after Petitioner told her to do so, and she appeared frightened. She pushed Petitioner away, and she went to the side of the road trying to get someone to pull over. Petitioner told her to calm down, and he had his hands on her shoulders. At one point, Tonya pushed Petitioner away so hard that she hit the side of the door of the van. (*Id.* at 91-92.) Eventually, Petitioner told Beau's brothers to get out of the van. Beau put his arms around Jake, because Jake was afraid. He then let Jake go. Beau went home with his father. (*Id.* at 93.) On the night of the incident at Bronner's, Beau knew that Petitioner was going to try to talk with Tonya, though he did not know where. He told his father that it was not a good idea and that he should not go. (*Id.* at 95.) Petitioner's green Pontiac was parked on the street, as usual, that night. They usually drove the van during the period after Tonya left. When Petitioner left that night, Beau went to the basement to play video games and watch television. Petitioner returned later and appeared normal, though a little tense, and Petitioner looked out the window at least once. (*Id.* at 96-99, 103.)

Frankenmuth Police Officer Jonathan Mason testified to having searched Petitioner's house and finding a coat with black gloves and a ski mask in the pockets. (*Id.* at 106-07.) He also found a notebook containing references to Petitioner having been served with a PPO on October 18, 2007, and having the officer who served it explain to him what it meant. (*Id.* at 109-11.) The notebook was admitted into evidence. (*Id.* at 112.) Mason read excerpts from the notebook about his contact with Tonya on Halloween, during which he offered to give the family a ride back to her car and then told Tonya he was keeping the children, at which point she began to yell about calling the police. (*Id.* at 113-14.) Mason testified that another notebook he found contained Petitioner's

writings about his intent with respect to Tonya. Mason summarized Petitioner's entries in the book as aggressive and angry. (*Id.* at 116.) At one point, Petitioner suggested that he was going to kill Tonya, in part to get revenge and in part to protect his children. (*Id.* at 117.) Petitioner repeatedly demonstrated his understanding that the PPO barred him from approaching Tonya. (*Id.* at 118-19.)

The defense presented a number of character witnesses, including Gregg "Kegger" Dickhausen, who testified that he spent the afternoon and evening of December 1, 2007, with Petitioner, and that Petitioner had not gone anywhere before Dickhausen left at 6:30 p.m. (Tr. V at 30-33.) On rebuttal, Detective Flathau testified that he had interviewed Dickhausen on April 8, 2008, at which time Dickhausen had told Flathau that he knew Petitioner had gone to Bronner's, and he had told Petitioner that it was a bad idea for him to do so. (*Id.* at 74-75.)

Petitioner's father, Ralph Zimmerman, was called by the defense. He testified that he went to his son's home on December 5, 2007, to pick him up for the PPO hearing. When he could not get into the house, Ralph broke in and found his son in his bed, unconscious following a suicide attempt. (*Id.* at 48-49.) He called 9-1-1, and the police arrived soon after, as they had been watching the house to execute an arrest warrant. (*Id.* at 49.) Petitioner left a suicide note, which eventually was read into the record by Frankenmuth Police Detective Randy Flathau. (*Id.* at 70-72.) In the note, Petitioner references his thoughts of killing Tonya and his unhappiness with the PPO. (*Id.*) On cross-examination, Ralph denied having seen his son attempt to force Tonya to stay in the marriage. (*Id.* at 56.) Based on that statement, the prosecution was permitted to extensively impeach Ralph with a "contract" that Petitioner had insisted Tonya sign and that Ralph had witnessed on August 12, 2007. The contract suggested that Petitioner had attempted to force his wife to remain in the marriage. Under the contract, Tonya was threatened that, if she left the marriage while the

children were still in the home, she would never see her children again. The contract stated that, once the children were gone, Tonya would never be permitted to divorce Petitioner. In addition, the contract stated that Tonya would not have contact with any of her friends. It also stated that, if Petitioner died of unnatural causes, Tonya understood that she could and would be charged with his death. (*Id.* at 57-61.) Petitioner filmed the signing of the contract. When the prosecutor began asking Ralph about the videotaping, defense counsel stipulated to the admission of the DVD as an exhibit. (*Id.* at 59, 65.) Defense counsel later attempted to argue that the DVD should not be played in the courtroom, based on Judge Kaczmarek's earlier ruling that the videotape and the contract were not going to be admitted. (*Id.* at 65.) In light of the stipulation, the court allowed the last portion of the videotape to be shown to the jury. (*Id.* at 65-66, 73.) That portion of the videotape showed Tonya reviewing the document before signing and asking what "coercion" meant. After being told that it meant being forced, she looked straight into the camera and said, "but I am being forced." (*Id.* at 64.)

At the conclusion of trial, on June 27, 2008, the jury found Petitioner guilty of aggravated stalking, extortion, unlawful imprisonment, and felonious assault. (Tr. VI at 83.) On August 14, 2008, Petitioner was sentenced to serve respective prison terms of 24 months, 84 to 240 months, 24 to 60 months, and 24 to 48 months. (Sentencing Transcript, (S. Tr.) at 39-40, docket #20.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on June 5, 2009, raised the same six issues presented in this application for habeas corpus relief, together with a claim of cumulative error that Petitioner has since abandoned.

(*See* Def.-Appellant's Br. on Appeal, docket #21.)  By unpublished opinion issued April 27, 2010, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 4/27/10 Mich. Ct. App. Opinion (MCOA Op.), docket #21.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same five claims presented to and rejected by the Michigan Court of Appeals.  Petitioner was granted leave to amend his application, in which he further developed his first issue.  By order entered September 27, 2010, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See Mich. Ord., docket #22.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court; (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.     Substitution of Trial Judge

In his first ground for habeas relief, Petitioner asserts that he was deprived of his rights under the Due Process Clause and Michigan law, when the presiding judge was replaced by a substitute judge during the course of trial. The Michigan Court of Appeals reviewed the claim only for plain error, because Petitioner had failed to make a contemporaneous objection.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-

37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in addressing Petitioner's claim. It is clear that the contemporaneous objection rule was well established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Moreover, the mere fact that the court evaluated the claim for plain error "does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even

where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice"); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011) (review for plain error does not waive a procedural default); *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster*, 324 F.3d at 437. Accordingly, review by this court is barred unless Petitioner can show cause and prejudice or a miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

To show cause sufficient to excuse his default, Petitioner must point to "some objective factor external to the defense" that prevented him from complying with the state procedural rule. *See Murray*, 477 U.S. at 488; *McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Factors that may establish cause include interference by officials, attorney error rising to the level of ineffective assistance of counsel, and a showing that the factual or legal basis for a claim was not reasonably available. *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010) (citing *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004) (citing *McClesky*, 499 U.S. at 493-94 (quotations omitted))). Petitioner has not even attempted to explain his failure to object. He therefore fails to demonstrate cause excusing his procedural default. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Moreover, Petitioner has not alleged or demonstrated a miscarriage of justice. Accordingly, Petitioner's claim is procedurally barred.

Further, even if Petitioner had not procedurally defaulted his claim, he would not be entitled to relief in this proceeding. To the extent that Petitioner complains that the judicial substitution was improper under MICH. COMP. LAWS § 6.440, his claim is not cognizable in this proceeding. "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is

in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 131 S. Ct. at 14; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

To the extent that Petitioner raises a claim under the Due Process Clause, he fails to demonstrate that the state court's decision was either contrary to or an unreasonable application of clearly established Supreme Court precedent. As previously discussed, in evaluating a claim on habeas review, this Court may consider only the clearly established holdings of the United States Supreme Court. *Williams*, 529 U.S. at 412. The Supreme Court has never held that the substitution of a trial judge violates a defendant's right to due process of law. As a consequence, Petitioner is not entitled to relief on his first habeas ground.

## II.    Insufficiency of the Evidence

In his second habeas ground, Petitioner contends that there was insufficient evidence to convict him of extortion. As a consequence, he contends, the trial court violated his right to due process by denying his motion to quash and his motion for a directed verdict on the extortion charge.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of

review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

The Michigan Court of Appeals analyzed Petitioner's claim as follows:

> Defendant argues that his due process rights were violated when the trial court denied his motion to quash the extortion charge. However, where the prosecutor presents evidence sufficient to prove defendant guilty at trial beyond a reasonable doubt, any error in the bindover is harmless. *People v Libbett*, 251 Mich App 353, 357; 650 NW2d 407 (2002).
>
> MCL 750.213 states in relevant part:
>
> > Any person who shall . . . orally or by a written or printed communication maliciously threaten any injury to the person . . . with

intent to compel the person so threatened to do or refrain from doing
any act against his will, shall be guilty of a felony . . . .

The testimony established that defendant approached the victim with a crowbar in his hand and told her that he had it to make sure that she did not leave before he had finished talking to her. Although defendant did not specifically state what he would do with the metal crowbar if the victim did not comply with his request, given the nature of the object and the stated reason why he had it readily available, the possibility of physical injury to the victim was real. Based on the record, there was sufficient evidence for the jury to conclude that defendant impliedly threatened to injure the victim, and that defendant made that threat with the intent to compel the victim from doing an act, i.e., leaving the parking lot before he had finished talking to her against her will. Defendant's argument therefore fails. (MCOA Op. at 3.)

As the Michigan Court of Appeals recognized, the testimony of the victim, which was corroborated by that of other witnesses, provided ample evidence to support all elements of the extortion charge. Petitioner's argument that the victim was not worthy of belief is unavailing, as the jury was charged with the responsibility for resolving evidentiary disputes and determining credibility, and it resolved those disputes against Petitioner. *See Jackson*, 443 U.S. at 319. This Court must defer to the jury's determination of the facts. *Id.* Moreover, the Michigan Court of Appeals found that the evidence was more than sufficient to meet the requirements of due process, a determination entitled to double deference under the AEDPA. *Davis*, 658 F.3d at 531. Applying that deference, I conclude that the state court's decision properly applied the facts of the case to the elements of the charged offense, as required by *Jackson*. The decision was a patently reasonable application of clearly established Supreme Court precedent.

III.    Challenge to the Jury Array and Dismissals for Cause

Petitioner claims that his right to a fair and impartial jury was violated when the trial court dismissed four jurors for cause after they revealed that they had been convicted of misdemeanors. The court of appeals concluded that Petitioner's claims were forfeited because Petitioner had failed to make a contemporaneous objection. As a consequence, the court reviewed the issue only for plain error affecting substantial rights.

As previously discussed, when a court has applied an independent and adequate state procedural rule to dismiss a claim, the issue is procedurally defaulted, and the federal court is precluded from considering that issue on habeas corpus review unless the petitioner demonstrates either cause excusing his procedural default and actual prejudice arising from the default or a fundamental miscarriage of justice. *See House*, 547 U.S. at 536; *Ylst*, 501 U.S. at 801; *Hicks*, 377 F.3d at 551. In Michigan, the failure to make a contemporaneous objection is an independent and adequate state procedural rule that, if relied upon, creates a procedural default. *See, e.g., Taylor*, 649 F.3d at 450; *Seymour*, 224 F.3d at 557. Moreover, as the Sixth Circuit repeatedly has recognized, "plain error review does not constitute a waiver of state procedural default rules." *Id.* (citing *Paprocki*, 869 F.2d at 284-85). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice or a miscarriage of justice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485. Petitioner has made no attempt to do so.

Even if Petitioner could demonstrate grounds excusing his default, his claim would fail. A criminal defendant is entitled to an impartial jury that was drawn from a fair cross-section of the community. *See Duren v. Missouri*, 439 U.S. 357 (1979). In order to establish a prima facie violation of the requirement, a defendant must show "(1) that the group alleged to be excluded is a

'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364. The Supreme Court has declined to define the term "distinctive group." *See Lockhart v. McCree*, 476 U.S. 162 (1986). The Sixth Circuit has held that, in order to be a distinctive group under *Duren*, the group must, at a minimum, be defined and limited by some factor and share a "common thread or basic similarity in attitude, ideas, or experience." *Ford v. Seabold*, 841 F.2d 677, 682 (6th Cir. 1988) (rejecting young adults and college students as distinctive groups, but accepting women as a distinctive group); *see also United States v. Fletcher*, 965 F.2d 781, 782 (9th Cir. 1992); *Barber v. Ponte*, 772 F.2d 982 (1st Cir. 1985); *Willis v. Zant*, 720 F.2d 1212 (11th Cir. 1983).

Applying the proper constitutional standard, the Michigan Court of Appeals rejected Petitioner's claim:

Criminal defendants are constitutionally entitled to an impartial jury that is drawn from a fair cross-section of the community. *People v Hubbard (After Remand)*, 217 Mich App 459, 472; 552 NW2d 493 (1996), citing *Taylor v Louisiana*, 419 US 522, 526-531; 95 S Ct 692; 42 L Ed 2d 690 (1975).

[T]o establish a prima facie violation of the fair cross-section requirement, a defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." [*Id.* at 473, quoting *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979).]

Defendant has presented no case law or evidence to support his argument that persons with a criminal record are considered a distinctive group. It is only a violation of the "fair cross-section" requirement if the group excluded is a distinct group in the community, *Duren*, 439 US at 364, so defendant's argument fails.

(MCOA Op. at 4.)

The court's reasoning was patently reasonable. No basis exists for concluding that misdemeanants are a distinctive group under the reasoning of *Ford*, 841 F.2d at 682, much less under clearly established Supreme Court precedent. Accordingly, Petitioner's third habeas ground is both procedurally defaulted and without merit.

IV.    Right to Present a Defense

In his fourth ground for habeas relief, Petitioner asserts that the trial court erred in refusing to admit evidence that the victim had previously opened bank accounts in someone else's name. Petitioner contends that the accounts were fraudulent and therefore relevant to the victim's credibility and motive to lie. In addition, he alleges that the court erred in refusing to admit the bank records of his alibi witness, which allegedly would have corroborated his alibi. Petitioner argues that the court's refusal to admit the evidence violated state evidentiary rules and deprived him of his right to present a defense.

To the extent Petitioner claims that the trial court's decision violated Michigan law or the Michigan Rules of Evidence, his claim is not cognizable on federal habeas corpus review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry as to whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-

examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour*, 224 F.3d at 552; *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations and internal quotation marks omitted). The Sixth Circuit recently explained:

> [A] "meaningful opportunity" is not "every opportunity," and relevant evidence is frequently excluded from trial. Trial judges must make "dozens, sometimes hundreds" of evidentiary decisions throughout the course of a typical case, and rarely are these of constitutional significance: "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689-90, 106 S. Ct. 2142 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)) (alterations and omissions in original). But while the Constitution leaves much in the hands of the trial judge, "an essential component of procedural fairness is an opportunity to be heard." *Id.* at 690, 106 S. Ct. 2142.

*Gagne v. Booker*, 596 F.3d 335, 340-41 (6th Cir. 2010). A proper inquiry into the constitutionality of a trial court's decision to exclude evidence begins with consideration of the relevancy and cumulative nature of the excluded evidence and the extent to which it was "central" or

"indispensable" to the defense. *Id*. at 341. Against this, courts must balance the state's interests in enforcing the evidentiary rule on which the exclusion was based. *Id.*

The Michigan Court of Appeals applied *de novo* review in analyzing the constitutional issue:

> Defendant also argues that the trial court's failure to admit evidence that the victim had previously opened fraudulent bank accounts in someone else's name deprived him of his right to present a defense. According to defendant, because the evidence was admissible to show the victim's motive to lie and make false allegations against him, the trial court abused its discretion when it excluded the evidence at trial. *People v Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002). An abuse of discretion occurs when a trial court chooses an outcome falling outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). We review de novo whether a defendant has been deprived the right to present a defense. *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002).
>
> The trial court did not abuse his discretion when holding that the bank records were inadmissible. Although a witness's credibility is always relevant and a party is entitled to introduce evidence assailing witness credibility, a party does not have an absolute right to introduce every piece of evidence that might bear on a witness's credibility. *People v Mills*, 450 Mich 61, 72; 537 NW2d 909, mod on other grounds 450 Mich 1212 (1995). "[T]he test is 'whether the evidence will aid the court or jury in determining the probative value of other evidence *offered to affect the probability of the existence of a consequential fact.*'" *Id.*, quoting Weinstein & Berger, Evidence, ¶ 401[05], p 401-29 (emphasis by *Mills* Court). Even if the victim had opened up a fraudulent bank account in someone else's name, given the lack of any connection to the instant case or her relationship with defendant, the evidence would have a limited value, if any, in helping the jury determine the probative value of the other evidence offered at trial. Nor would such evidence have a tendency to show the victim had a motive to file false allegations against defendant, which is what defendant argues was the relevance of the evidence.
>
> Defendant also argues that the trial court abused its discretion and deprived him of his right to present a defense when it excluded his alibi witness's bank records. The record reflects that while the trial court considered whether to admit defendant's alibi witness's bank records, it reserved its ruling on the matter until defendant actually sought to introduce the records. Our review of the record reflects that defendant did not make such an attempt. Thus, any error in the failure to admit the records cannot be attributed to the trial court.

(MCOA Op. at 4-5.)

The state court reasonably concluded that the evidence that the victim had opened a bank account in another name lacked probative value with respect to the issues in dispute at trial. Contrary to Petitioner's contentions, the fact that the victim had opened such an account had no tendency to show that the victim had a motive to make false criminal reports and give false testimony against Petitioner. The evidence was clearly tangential and had no bearing on the probative value of any other evidence.

With respect to the bank accounts of Petitioner's alibi witness, the court of appeals concluded that Petitioner failed to make an attempt to introduce the documents, after the trial judge had reserved its ruling. The appellate court's conclusion is a finding of fact that is presumed to be correct, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. *See also Sumner*, 449 U.S. at 546 (applying presumption of correctness to the findings of state courts of appeal). Petitioner makes no attempt to rebut the presumption. Indeed, in support of his claim, Petitioner points only to the trial judge's consideration of the prosecution's motion to exclude the bank record. At that point in the proceedings, as the court of appeals found, the trial court reserved its ruling until the bank record was introduced. (*See* Tr. V at 6-8.) Petitioner does not even allege that the court's finding was erroneous, and it is beyond dispute that Petitioner made no attempt to introduce the evidence. Petitioner therefore fails to rebut the presumption of correctness afforded the state court's determination.

V.     Admission of an Unauthenticated Letter

Petitioner alleges in his fifth habeas ground that he was denied due process by the admission of the January 5, 2008 letter, which he claims was unauthenticated, lacked a proper foundation, and lacked proof of a chain of custody.

As previously discussed, violations of the Michigan Rules of Evidence or other state law are not cognizable on federal habeas corpus review. *See* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Coleman*, 268 F.3d at 439; *Seymour*, 224 F.3d at 552. Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

The Michigan Court of Appeals concluded that Petitioner had failed to demonstrate evidentiary error, as the letter was self-authenticating and any gap in the chain of custody went to the weight of the evidence, not its admissibility. That finding was patently reasonable, given the mailing and return addresses on the letter, the testimony of Deputy Delong that he opened the letter from the incoming mail, and the content of the letter. Moreover, even if the letter was improperly admitted under state law, the state-court's evidentiary ruling was neither contrary to nor an

unreasonable application of a decision reached by the United States Supreme Court. *See Sanders*, 221 F.2d at 860.

VI.     Prosecutorial Miconduct and Ineffective Assistance of Counsel

In his sixth and final ground for habeas relief, Petitioner contends that the prosecutor engaged in misconduct violating Petitioner's right to due process by intentionally mischaracterizing the evidence at several key points during his opening statement. First, the prosecutor allegedly accused Petitioner of trying to kill the victim. (Appellant's Br. on App., docket #21 (citing Tr. II at 29).) Second, the prosecutor stated that Petitioner had "cracked the passwords of his wife's e-mail account." (*Id.* (citing Tr. II at 16).) Third, the prosecutor allegedly accused Petitioner of wanting to run his wife off the road, a matter that was irrelevant to the pending charges. (*Id.* (citing Tr. II at 29).) Fourth, the prosecutor made reference to Petitioner going to jail and being in jail. (*Id.* (citing Tr. II at 32).). And, fifth, the prosecutor referenced a plot by Petitioner to obstruct justice and set up a drug deal. (*Id.*) In addition, Petitioner argues that he was denied a fair trial when the prosecutor introduced other-acts evidence without prior notice. Petitioner contends that trial counsel was ineffective in failing to object to the misconduct, failing to move to exclude the other-acts evidence, and failing to request a curative instruction.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the

prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

Defendant argues that he was deprived of his right to a fair trial when the prosecutor made several misstatements of the evidence during his opening statements. Again, we disagree. To the extent that defendant preserved this issue for appeal, we review his arguments de novo. *People v Pfaffle*, 246 Mich App 282, 288; 632 NW2d 162 (2001). We review defendant's unpreserved claims for plain error affecting substantial rights. *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003).

Prosecutorial misconduct issues are decided on a case-by-case basis, and the reviewing court must examine the record and evaluate a prosecutor's remarks in context. *Thomas*, 260 Mich App at 454. The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007).

Contrary to defendant's argument, the challenged comments made by the prosecutor during opening statements were proper based on expected testimony. *People v Johnson*, 187 Mich App 621, 626; 468 NW2d 307 (1991). The record reflects that, with the exception of the prosecutor's statements that defendant tried to suffocate the victim and that he had cracked the victim's e-mail account passwords, the prosecutor elicited testimony that supports the statements made during his opening. And even though there was no direct testimony that defendant either tried to suffocate the victim or cracked the victim's email accounts, it can be inferred from the victim's testimony that defendant might have done so. As for the former, the victim testified, "We had sex. And while he was laying on top of me he covered my mouth." The prosecutor cannot be faulted if the witness gave a less detailed answer that he was expecting. *Id.* Further, the jury was instructed that attorneys' statements were not evidence and could not be considered when deciding defendant's guilt. "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

Defendant also argues that he was denied a fair trial when the prosecutor introduced other acts evidence without providing proper notice pursuant to MRE 404(b). During direct examination, the prosecutor elicited testimony from the victim that defendant had told her that she had AIDS because she had had an affair with another man. Given the context of the victim's testimony, defendant's comment would constitute a prior statement, not a prior act. Only testimony regarding other acts must meet the requirements of MRE 404(b). *People v Goddard*, 429 Mich 505, 518; 418 NW2d 881 (1998); *People v Rushlow*, 179 Mich App 172, 176; 445 NW2d 222 (1989). Accordingly, the admissibility of defendant's statement was governed by general relevancy principles. Defendant does not argue that the testimony was otherwise inadmissible.

Lastly, defendant argues that his trial counsel was ineffective for failing to object to the aforementioned statements and conduct. Because the prosecutor's statements and questions were not improper, defendant's trial counsel was not ineffective for failing to object below. *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

(MCOA Op. at 6-7.)

While the court of appeals did not cite federal cases, it conducted the correct inquiry: whether Petitioner was denied a fundamentally fair trial. The court recognized that the prosecutor's statements were part of a summary of expected testimony, not a bare statement of fact. In addtion, the prosecutor's statements about the expected testimony were, for the most part, fully supported by the witnesses' actual testimony. In addition, in every case, the prosecutor indicated which witnesses he expected to give each particular statement. To the extent that any witness did not give the expected testimony, that failure likely would be held against the prosecutor. Further, as discussed by the court of appeals, the only statements not fully supported by the testimony were insignificant. Although the victim did not actually say that Petitioner tried to suffocate her, she did testify, consistent with the prosecutor's remarks, that, while lying on top of her, Petitioner had covered her mouth with his hand and whispered her lover's name in her ear. (Tr. III at 20.) Moreover, the prosecutor's comment that Petitioner had cracked the victim's email passwords carried little, if any,

negative meaning. Taken together, the prosecutor's unsupported statements had virtually no tendency to distort the evidence or mislead the jury. *See Young*, 470 U.S. at 11-12. In addition, as recognized by the court of appeals, any possible prejudice was further reduced when the jury was instructed that counsel's statements were not evidence. *Id.* The court of appeals reasonably and properly rejected Petitioner's claim of prosecutorial misconduct based on the prosecutor's opening statement.

Petitioner's next claim of prosecutorial misconduct concerns the admission of evidence of other bad acts. As the Sixth Circuit recognized in *Webb v. Mitchell*, 586 F.3d 383, 397 (6th Cir. 2009), a complaint about the introduction of other-acts evidence is not properly framed as a prosecutorial-misconduct challenge, as it amounts in the end to a challenge to the trial court's decision to allow the introduction of this evidence. *Id.* (citing *Coleman*, 268 F.3d at 439). "A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings, . . . and a trial court violates due process only if admitting the evidence under state law violates fundamental conceptions of justice." *Id.* (internal quotations omitted). The Michigan Court of Appeals addressed the issue under state evidence law, not as a claim of prosecutorial misconduct. It found that the admission of Petitioner's prior statement did not constitute the admission of a prior act and therefore was governed only by general relevancy principles. The state-court's determination of its own law is not subject to review in this proceeding. *See Estelle*, 502 U.S. at 67-68.

Moreover, to the extent that Petitioner intends to raise a constitutional claim based on the admission of the evidence, his claim must fail. No clearly established Supreme Court precedent recognizes that a state court violates the Due Process Clause by permitting propensity

evidence in the form of other bad acts. In *Estelle*, 502 U.S. at 75, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. The Court stated in a footnote that, because it did not need to reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior-acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512.

Finally, Petitioner argues that his attorney's failure to object to the admission of other-acts evidence amounted to ineffective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. Moreover, when a federal habeas court reviews a state court's application of

*Strickland*, the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Here, the state court found that, because the prosecutor's statement and questions were not improper, defense counsel was not ineffective for failing to object. That determination was patently reasonable. As the Sixth Circuit repeatedly has recognized, counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004). Moreover, Petitioner fails entirely to demonstrate the necessary prejudice.

In sum, the state-court's rejection of Petitioner's sixth habeas ground was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date: August 19, 2013                           /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).